IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs August 6, 2002

## STATE OF TENNESSEE v. TONY MARTIN

**Direct Appeal from the Criminal Court for Shelby County**
**No. 00-02771    Bernie Weinman, Judge**

**No. W2001-02221-CCA-R3-CD  - Filed February 7, 2003**

The defendant was convicted by a jury of second degree murder and sentenced to twenty years imprisonment as a violent offender.  On appeal, the defendant contends that (1) the evidence was insufficient to support a second degree murder conviction, and (2) the jury instructions were erroneous, leading to a lower burden of proof for conviction and prejudice to the defendant.  We agree the jury instructions were erroneous, yet the error was harmless.  We disagree the evidence was insufficient to support second degree murder and therefore affirm the conviction.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which THOMAS T. WOODALL, J., joined.  JOSEPH M. TIPTON, J., filed a concurring opinion.

Steve Temple and Jim Hale, Memphis, Tennessee (at trial); A C Wharton, Jr., Public Defender; and W. Mark Ward and Tony N. Brayton, Assistant Public Defenders (on appeal), for the appellant, Tony Martin.

Paul G. Summers, Attorney General and Reporter; J. Ross Dyer, Assistant Attorney General; William L. Gibbons, District Attorney General; and Camille N. McMullen, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### Background

On March 14, 2000, the defendant, Tony Martin, was indicted for second degree murder, in violation of Tennessee Code Annotated section 39-13-210, resulting from the following incident. On November 23, 1999, an attempted drug deal between a number of men, including the defendant and the victim, resulted in a fight, gunshots, the defendant being shot twice, and the death of the victim.  The circumstances surrounding the shooting were disputed at trial.  After weighing the

evidence, a jury found the defendant guilty of second degree murder, as charged in the indictment.

This much about the events in question is uncontroverted: The victim and his brother, Cedric Words, met three men: the defendant, "Little Cain," and another unnamed individual, at the Red Lobster Restaurant near the Wolfchase Galleria Mall outside Memphis. The victim brought a handgun to the meeting. The men had drinks at the nearby Bahama Breeze Restaurant. After having drinks, the men began to drive around searching for a place to conduct their drug transaction. The victim and his brother, driving a Toyota Corolla, were followed by the other men, who were in a BMW. At some point, the defendant got out of the BMW and into the Corolla. The defendant first got into the back seat but was asked to get into the front seat, which he did. The victim's brother got into the rear seat behind the defendant. The defendant was armed with a handgun and carrying a bag that was supposed to contain cocaine, the sale of which was the reason for the meeting. As the three men in the Corolla drove around, trying to decide where to consummate the actual drug transaction, they ultimately returned to the Wolfchase Mall parking lot, where the fatal shooting occurred. The details at this point were disputed at trial.

**Trial**

The defendant was tried by a jury on January 23-24, 2001. The State called as its witnesses: Cynthia Words, Cedric Words, Lois Wright, Ronny Lindsey, Dr. O.C. Smith, Shawn Boyette, Brian Culley, Sherman Bonds, Thomas Overton, Kenneth Dansberry, Robin Aubert-Hulley, Laura Hodge, Don Carman, William Smith, Robert Shemwell, Officer Gilbertson, and Shana Powell. The defendant testified on his own behalf.

Cedric Words, the victim's brother, testified that after school, he and his brother went to the Red Lobster at Wolfchase Mall to meet Kevin King, known as "Little Cain," the defendant, and another man in order to get some cocaine. He said his brother was armed with a .45 caliber pistol. After meeting at the Red Lobster, they all went to the nearby Bahama Breeze Restaurant to have a drink. He said they then went outside, but "they told us this wasn't a good place to make a transaction," so, in two cars -- he and his brother in a Toyota Corolla, the other three men in a BMW -- they went "behind Firestone." At Firestone, the defendant, carrying a package, got into the backseat of the Corolla. Cedric Words refused to get in the BMW. He, the victim, and the defendant then went to a gas station in the Corolla, where Cedric Words got in the back seat, behind the defendant who was now in the front passenger seat. They then drove to "Walgreens," but still did not conduct the drug deal. They then proceeded back to the Wolfchase Mall. During this time, Cedric Words said his brother kept asking to see the package, but the defendant would not "take it out." When they once again reached Wolfchase, Cedric Words said that the defendant pulled out the package and handed it to his brother, who opened it. Cedric Words said at this point the defendant pulled out a pistol, yelled "Drop it off," and shot his brother.

Cedric Words testified that he wrestled the gun from the defendant after the defendant shot his brother. He said his brother slammed the car into park and jumped out of the car. He said that while he took the defendant's gun, his brother shot the defendant twice from outside the driver side

-2-

door. He said his brother then told him to hide the package and the other drug paraphernalia they brought to the deal. He saw his brother walk around to the passenger side of the car and "unloaded a couple of more times." He then went to the Red Lobster parking lot and hid the drugs. When he came back, he saw his brother, who was lying on the ground, getting some assistance from a white man and a woman from the Red Lobster. He then ran over to the defendant, who was still on the ground, and started hitting him in the face and kicking him. Despite the arrival of paramedics, his bother died at the scene. Cedric Words indicated he thought the package they had been dealing with contained cocaine.

On cross-examination, Cedric Words again testified that he switched seats with the defendant at the gas station. He said they did not finish the drug deal at the Walgreens because "Little Cain," speaking to them from the other car, said that was not a good place. Cedric Words said, after leaving the Walgreens and heading back to the Wolfchase Mall where they started, his brother questioned why they drove around. After they got back to Wolfchase, Cedric Words again said that as his brother asked to see the package, the defendant gave it to him and then suddenly shot him. He said the defendant did not have a chance to fire more than the one shot, because he grabbed the gun from him. When asked about a statement he gave the police, in which he said he had been on the phone with his girlfriend at the time the defendant shot his brother, Cedric Words stated that was an inaccurate statement. He stated that he had been on the phone with her earlier, but was not at the time of the shooting. He again described that after his brother was shot, his brother got out of the car and shot at the defendant, then walked around the car and shot the defendant again. Cedric Words stated that he only heard the second shots and did not see them, because he was hiding the drugs. He said it could have been "five, or six, or eight" shots.

Cedric Words testified that, after his brother was shot, he did not render aid, but hid the drugs and drug paraphernalia, because that is what his brother wanted him to do. He said after hiding the drugs, he returned to the car, saw his brother passed out, and then went to the defendant and started beating him. Cedric Words said that he thought the Corolla was about six-feet wide and that he had stopped his brother from shooting the defendant even more by saying, "Stop, stop" to him and grabbing the gun.

On redirect, Cedric Words testified that his brother first started shooting the defendant from outside the driver's door. He said after this shooting, his brother went to the back of the car, got the drugs, and asked him to hide them. He said, as he was hiding the drugs, he heard about three or four gun shots.

Lois Wright, who worked at the Red Lobster at the time of the incident, testified she was driving along with her boyfriend and, as she was pulling into the mall parkway, she saw a "ruckus." She said she saw a guy running next to a car, which she thought might have been due to a flat tire. She then heard a "pop, pop." Her boyfriend then told her that somebody had been shot. She testified that she was about a car length away from the incident. She saw a black man running along the car and heard three noises, which she could not confirm were gunshots. On cross-examination, she said she thought there was a total of four people involved in the incident, although she could not be sure.

Ms. Wright's boyfriend, Thomas Overton, testified he was riding with Ms. Wright on Perimeter Drive at the Wolfchase Mall when he heard a "boom." He then noticed a car going rather slowly and running into a curb. He saw people hanging out of the car and running with the car. Immediately afterwards, he saw someone jump over from the back seat, lean over the front seat, and then shots were fired. He said Ms. Wright and he were very close to the incident. He then called 9-1-1. After waiting for the shooting to stop, he then approached the car. He indicated he saw someone exit the rear driver's-side door and begin running, while the driver and another guy were standing at the hood of the car. He testified he began helping the victim, who he believed was dying. He said the victim then looked straight at the other man lying in front of him (the defendant) and said, "He shot me." Overton testified that he then had a discussion with the defendant, in which the defendant told him he had been shot twice and said that "his brother" had shot him.

Ronny Lindsey, owner of a small construction company doing work at the Bahama Breeze Restaurant, testified that, on November 24, 1999, he found a "baggie" and a black box in the parking lot. He then called the police, who he witnessed taking pictures and tracing out the area. On cross-examination, he indicated the "baggie" and box were found in a driveway that ran between the Red Lobster and the Bahama Breeze.

Officer Shawn Boyette responded to Lindsey's call. He testified he met Lindsey at the scene, where the officer recognized the property found at the scene as a white powdery substance in a bag, a side arm holster, and a small digital scale.

Several Police Officers responded to the shooting incident. Officer Brian Culley testified that he responded to a 9-1-1 call indicating shots fired at Wolfchase. His primary responsibility was protecting the crime scene, including two pistols that were found. On cross-examination, Officer Culley stated he believed one of the weapons was a .9 millimeter and the other a .45 caliber pistol. He said the guns were found about 25-35 feet from the victim. He also testified that the victim was found on the right side of the car, face up, and that the defendant was also in that vicinity.

Officer Sherman Bonds, the crime scene coordinator, also testified to the discovery of the two pistols; one under a truck, the other in a grassy area on the side of the truck. He stated they found one .45 caliber pistol and five live rounds. Additionally, they found a .9 millimeter pistol, two spent .45 caliber shell casings, and two pieces of bullet fragments. On cross-examination, Officer Bonds stated the .45 caliber pistol was found approximately forty-seven (47) feet from the deceased. He also indicated a large amount of cash was found in the victim's rear pocket. He said one of the spent .45 casings was found on the passenger-side floor board of the vehicle, the other underneath the vehicle. He said he found no .9 millimeter casings around the vehicle and that the fragments they found had not been tested to determine if they were from a .9 millimeter pistol. Based on his experience, he testified that both a spent .45 caliber and a spent .9 millimeter casing will be ejected from the gun "up and to the right."

On redirect, Officer Bonds reviewed a sketch of the crime scene, as well as several photographs. He identified a number of locations where property involved in the investigation had

been found. On re-cross, he stated the only two bullet fragments found at the scene were located on the passenger side of the vehicle.

Officer Robin Aubert-Hulley, with the Crime Response Unit of the Memphis Police Department ("MPD"), testified she conducted an inventory search of the Corolla on December 6, 1999, and identified a spent .9 millimeter casing found inside the car, in the right rear of the front passenger seat. She also testified that a lot of white powdery substance was found throughout the car. Officer Kenneth Dansberry, with the MPD Property and Evidence Division, testified that the powder found in the bag tested negative for drugs.

Two Tennessee Bureau of Investigation (TBI) agents testified. Agent Laura Hodge, a gunshot residue analyst, testified that, based on the gunshot residue, the TBI could not eliminate the possibility that the defendant fired or handled a gun. Additionally, the TBI could not eliminate the possibility that Cedric Words fired a gun. This latter point was stressed again on cross-examination. Agent Don Carman, whose specific duties with the TBI included ballistics, testified that the .9 millimeter casing had been fired from the .9 millimeter pistol submitted as evidence in this case. Additionally, he said that gunshot residue, found on the pants of the defendant, was consistent with the same pistol. On cross-examination, Agent Carman stated that the ballistics test could not exclude the .9 millimeter pistol as having fired the bullet that he received for testing. On redirect, he stated it was conclusive that the .9 millimeter pistol had been fired. On recall, Agent Carman stated that, although he could not conclude the bullet came from the .9 millimeter pistol, he could not eliminate the pistol as having fired the bullet. He said he could eliminate the .45 as having fired the bullet. On cross-examination, he indicated a hole found in the pant leg was consistent with a bullet fired from less than four feet.

Officer William Smith, with the MPD, testified he was one of the first officers at the crime scene. He saw a commotion and two men on the ground. He noticed the victim had a gunshot wound to his right arm and blood on his shirt. On cross-examination, he also noted the individual on the ground (the defendant) had been shot in his arm and his leg.

Officer Robert Shemwell, with MPD homicide, testified that the victim had two bundles of cash on him, totaling $5500.00. That amount was enough, according to Shemwell, to purchase "one kilo" of cocaine. He said there was a powdery substance, found on the dashboard of the Corolla, which tested negative for drugs. On cross-examination, he stated there was an additional bullet fragment found outside the rear of the passenger side of the car and that an additional bullet fragment was found outside the rear passenger door near a curb. He testified he did not recall there being any bullet holes in the passenger door.

Dr. O.C. Smith, the Shelby County Medical Examiner, testified the victim died as a result of a gunshot wound to the chest. He said the bullet entered through the upper arm and lodged in the heart, after a downward course. He believes the victim's arm was elevated and that he was shot from within 24 inches. On cross-examination, he stated he was of the opinion the victim's arms were not down by his side but were at a higher level. Upon recall, Dr. Smith identified the bullet that was

removed from the victim. On cross-examination, he indicated he could identify the bullet because it was labeled by number.

**Defense:**

The defendant testified on his own behalf. He stated that he, along with Kevin King and another man, went to the mall to meet some guys, then went to King's house to get a package. They then headed to the Texaco with the package. The defendant stated he was unarmed at this time, although King was armed.[1] At the Texaco, the defendant stated he got into the victim's car but that they did not want to do the drug deal at the Texaco. He stated Cedric had him sit in the front seat with Cedric in the back behind him. The three men then proceeded back to Wolfchase. Once back at Wolfchase, he said he handed the package to Cedric in the backseat and asked him for the money. They were driving slowly through the Wolfchase parking lot when Cedric asked him to get out of the moving car. The defendant then noticed Cedric fumbling around in the backseat and saw the barrel of a gun. Cedric then shot him in the leg. After being shot, the defendant stated he produced his gun. There was a struggle over his gun, and it went off, shooting the victim. At this point, he stated the victim had not yet produced a gun but, after being shot, the victim got out of the car and shot the defendant from outside the car. He saw Cedric over near a truck and then he saw the victim stumbling against the car hood. He said Cedric then came back to the scene and started kicking him, while the victim, Cedric's brother, was receiving aid from a white man.

On cross-examination, the defendant admitted he brought a .9 millimeter pistol and drugs into the Corolla. He said it was the victim, not Cedric, doing all the talking and running the deal. The defendant admitted that he was in the Corolla in order to transact a drug deal. He stated that he did not even know that he had shot the victim until after the victim had shot him the second time. He indicated the victim was shot during the struggle for the gun.

In sum, the State's theory was that the defendant was involved in a drug deal, where he was trying to sell fake drugs to the Words. The defendant then initiated the shooting. The defense theory is that the Words attacked the defendant first. Therefore, he was acting in self-defense.

The defendant was convicted of second degree murder and sentenced to twenty years as a violent offender to the Tennessee Department of Correction. The defendant's motion for a new trial was denied.

**Issues**

The defendant raises two issues:
(1)     The evidence was insufficient to convict him of second degree murder; and
(2)     The jury instructions contained a faulty definition of "knowing," as applied to

---

[1] The defendant was armed upon entering the Corolla, as he admitted during cross-examination.

second degree murder, therefore lowering the State's burden of proof to find the defendant guilty.

## Sufficiency of the Evidence

The defendant argues the evidence submitted at trial was insufficient to support his conviction for second degree murder. Specifically, he claims the State submitted no proof, other than that the defendant was armed and conducting a drug deal to prove that he was aware that his conduct was reasonably certain to cause the death of the victim.

When reviewing the trial court's judgment, this Court will not disturb a verdict of guilt unless the facts of the record and inferences which may be drawn from it are insufficient as a matter of law for a rational trier of fact to find the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979); see also Tenn. R. App. P. 13(e); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). In other words, this Court will not reevaluate or reweigh the evidence brought out at trial. It is presumed that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Since a verdict of guilt removes the presumption of a defendant's innocence and replaces it with a presumption of guilt, the defendant has the burden of proof on the sufficiency of the evidence at the appellate level. State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973).

In the present case, the defendant was convicted of second degree murder. Second degree murder is "[a] knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1). A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result. Tenn. Code Ann. § 39-11-106(a)(20). On appeal, the burden is on the defendant to prove that no rational jury could have found that the defendant was aware that his conduct was reasonably certain to cause the death of the victim.

The defendant posits that the State's proof stressed the fact that this case involved a drug deal where the participants were armed and that the State "presented no other proof that the appellant was aware that his conduct was reasonably certain to cause the death of the alleged victim. At most, the proof shows that the appellant should have been aware of high risk that a death might occur." We disagree. There is more than ample evidence presented to prove the defendant was aware that his conduct was reasonably certain to cause the death of the victim. The conduct in question here is not the underlying drug deal or the bringing of a weapon to that drug deal, but the conduct of the defendant pulling out his weapon and shooting the victim.

Cedric Words testified that the defendant pulled out a pistol, yelled "Drop it off," and shot his brother. Additionally, evidence was presented that the victim died as a result of a shot fired from the gun the defendant brought into the Corolla. There was evidence presented that this was a drug deal

that went bad.

The defendant claims that Cedric Words shot him first and that he produced his gun only after being shot. He claims the gun went off during a struggle and must have accidentally shot the victim, ultimately resulting in the victim's death. Effectively, the defendant is arguing that, even if he did shoot the victim, it was accidental and, moreover, in self-defense. The defendant specifically raises self-defense in his motion for new trial.

A rational trier of fact, resolving all conflicts in the testimony and drawing all reasonable inferences from the evidence in favor of the State, could have accepted the testimony of Cedric Words, that the defendant shot his brother first, and rejected the defendant's version of events, that Cedric Words shot him first. The jury could have made the reasonable inference that the defendant was involved in a drug deal with the intention of selling the victim fake drugs and that the defendant shot the victim when the victim began to suspect he was going to be ripped off.

The jury was also free to reject the defendant's claim of self-defense. Whether a defendant acted in self-defense is a factual determination within the province of the jury. State v. Goode, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997); State v. Ivy, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993). This Court recently affirmed this standard, stating:

> Whether the attempt to kill or killing of one person by another occurs under circumstances which justifies the act under the doctrine of self-defense, or is the result of some other motive, it remains a question of fact to be determined by the jury under proper instructions and from consideration of all the evidence. The jury is not obligated to believe the Appellant's version of events as to self-defense. The issue of self-defense in a murder or attempted murder prosecution is always a question of fact to be determined by the trier of fact.

State v. Ervin, No. W2000-01035-CCA-R3-CD, 2001 Tenn. Crim. App. LEXIS 70, at *7 (Jackson, Jan. 31, 2001). In the present case, the jury was properly charged as to self-defense and rejected its application. There is nothing in the record that preponderates against that finding.

The defendant has failed to meet his burden of proving the evidence was insufficient to support a second degree murder conviction. A rational jury could have determined that the defendant shot the victim at close range and was aware that shooting was likely to cause the victim's death. Additionally, that same rational jury could have rejected the defendant's claim that he shot in self-defense.

**Jury Instructions**

The defendant's second issue is that the trial court improperly instructed the jury as to the knowing element of second degree murder. The instruction is as follows:

"Knowingly" means that a person acts knowingly with respect to the conduct or to the circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to the result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.

The defendant is correct in asserting this instruction was in error, and the State does not contest that it was erroneous. Second degree murder is a result of conduct offense and, as a result of conduct offense, the nature of the conduct causing the result is inconsequential. State v. Ducker, 27 S.W.3d 889, 896 (Tenn. 2000). The State concedes that the jury instruction should have only included language that "[a] person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-106 (a) (20). Notably, this Court recently suggested that the knowing element in a second degree murder case should be defined as: "Knowingly" means that a person acts with an awareness that [his] [her] conduct is reasonably certain to cause the death of the alleged victim. State v. Page, 81 S.W.3d 781, 788 (Tenn. Crim. App. 2002). Despite the concession that the jury instructions were erroneous, the State claims that the erroneous instructions were harmless error, shown in part by the defendant's claim of self-defense, which inherently implies that the defendant was aware that his conduct was reasonably certain to cause the result, making the circumstances surrounding the conduct irrelevant. In other words, the actual jury instructions, which did include language allowing for the finding of a knowing mens rea if the defendant was aware of the nature or circumstances of his actions, were not prejudicial to the defendant, because the higher threshold of knowing the conduct was reasonably certain to cause the *result* was still met.

**Harmless Error Analysis**

The harmless error inquiry into a failure to instruct on an essential element of a crim in a case should be whether it is clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error. Ducker, 27 S.W.3d at 899, *citing* Neder v. United States, 527 U.S. 1, 18, 119 S. Ct. 1827, 1838, 144 L. Ed. 2d 35 (1999). A reviewing court does not serve as a second jury, but asks whether the record contains evidence that could rationally lead to a contrary finding with respect to the omitted element. If not, there is no harmless error nor a compromise of society's interest in the fundamental fairness in a jury trial. Ducker, 27 S.W.3d at 899. A defendant has the constitutional right to complete and accurate jury instructions, and the failure to give such instructions deprives the defendant of the constitutional right to a jury trial. State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990). In jury instructions, the omission of an element of the offense is subject to constitutional analysis; whether the State can prove harmless error beyond a reasonable doubt. State v. Walker, 29 S.W.3d 885, 893 (Tenn. Crim. App. 1999).

Applying the above to the present case, we must determine whether, if the proper definition of knowing as suggested in <u>Page</u> had been used ("Knowingly" means that a person acts with an awareness that [his] [her] conduct is reasonably certain to cause the death of the alleged victim), does the record contain evidence leading to a contrary result. We conclude it does not.

The primary dispute in this trial was whether the defendant fired his gun at the victim first or was fired upon first, prompting him to wield his gun in self-defense. It is undisputed that the defendant had a handgun, pulled it out, and that the gun was fired and caused the death of the victim. It belies common sense to believe that, if the defendant did indeed fire his gun first at close range, he was not aware that his conduct was reasonably certain to result in the death of the victim. There was ample evidence produced at trial, primarily the testimony of Cedric Words, to allow a rational jury to find that the defendant did fire his weapon first. We will not serve as a second jury and speculate as to the credibility of the witnesses at trial. We will only determine if a rational jury could have made the determinations it did.

Holding that a rational jury could have determined that the defendant fired his weapon first, we conclude the jury instruction, containing elements of knowing involving the nature and circumstances as well as the result of conduct element, was harmless beyond a reasonable doubt. Despite the nature and circumstances given in the definition, it is beyond a reasonable doubt that a rational jury could conclude that the defendant was aware the result of his conduct, the firing of the gun at close range resulting in the death of the victim, was reasonably certain.

The defendant additionally argues the State's case centered on the nature and circumstances of the defendant's conduct, i.e. the drug deal. We disagree. As discussed, the dispositive issue at trial was who shot first. The fact that the defendant and the victim were involved in a drug deal was not the focus of the State's case. As we reviewed the State's closing argument, it is clear and was necessary that they mention the drug transaction. However, it is equally clear that the State did not attempt to lessen its burden of proof. The State's closing argument focused primarily on the evidence they claimed proved who shot first and negated the defendant's self-defense argument.

**CONCLUSION**

We affirm the judgment of the trial court.

_____

JOHN EVERETT WILLIAMS, JUDGE